JEFFREY J. GONDA
ANGELA C. LONG
LONABAUGH & RIGGS, LLP
P.O. Drawer 5059
Sheridan, WY  82801
Telephone: (307) 672-7444
Facsimile:  (307) 672-2230
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STEVEN DUFFY, and NORTHERN ROCKIES NEURO-SPINE, PC, a Montana corporation,<br>　　　　Plaintiffs, | ) ) ) ) | |
| 　　　vs. | ) ) | CIVIL NO.  12-CV-197-SWS |
| SHEFFIELD, OLSON & MCQUEEN, INC., a Minnesota corporation, and FARMERS COOPERATIVE ASSOCIATION OF GILLETTE, WYOMING, a Wyoming nonprofit corporation,<br>　　　　Defendants. | ) ) ) ) ) | |
| FARMERS COOPERATIVE ASSOCIATION OF GILLETTE, WYOMING, a Wyoming nonprofit corporation,<br>　　　　Third-Party Plaintiff, | ) ) ) ) ) | |
| 　　　vs. | ) ) | |
| BARDEN INSURANCE GROUP, INC, an Arizona corporation and AMERICAN NATIONAL INSURANCE COMPANY,<br>　　　　Third-Party Defendants. | ) ) ) ) ) | |

## PLAINTIFF DUFFY'S OPENING BRIEF

## <u>TABLE OF CONTENTS</u>

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Issue Presented for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Certificate of Compliance with Rule 32(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## **TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) . . . . . . . . . . . . . . . . . . . . 15

*Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) . . . . . . . . . . . . . . . . . . . . . . 16, 25, 30, 31

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20, 33

**Tenth Circuit Cases**

*Buckardt v. Albertson's Inc.*, 221 F. App'x 730 (10th Cir. 2007) . . . . . . . . . . . . . . . . . 25

*Caldwell Life Ins. Co. of N. Am.*, 287 F.3d 1276 (10th Cir. 2002) . . . . . . . . . . . . . . . . 25

*Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998) . . .16

*Chiles v. Ceridian Corp.*, 95 F.3d 1505 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Deboard v. Sunshine Min. & Ref. Co.*, 208 F.3d 1228 (10th Cir. 2000) . . . . . . . . . . . . 33

*Degrado v. Jefferson Pilot Financial Ins. Co.*, 451 F.3d 1161 (10th Cir. 2006) . . . . . . 16

*Foster v. PPG Indus., Inc.,* 693 F.3d 1226 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . 16, 17, 30

*Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187 (10th Cir. 2009) . . . . . . . . . . . 24, 29

*McGraw v. Prudential Ins. Co. of America*, 137 F.3d 1253, 1259 (10th Cir. 1998) . . . 15-17, 19, 23,
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Pratt v. Petroleum Prod. Mgt. Inc. Empl. Sav. Plan & Trust*, 920 F.2d 651 (10th Cir. 1990)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Rekstad v. U.S. Bancorp,* 451 F.3d 1114 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 25

*Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 n.4 (10th Cir. 1992) . . . . . 15, 22

*Semtner v. Health Serv. of Okla.*, 129 F.3d 1390 (10th Cir. 1997) . . . . . . . . . . . . . . . 15

*Torix v. Ball Corp.*, 862 F.2d 1428 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . .15

**Other Cases**

*Adair v. El Pueblo Boys' and Girls' Rnach, Inc. Long Term Disability Plan*,
2007 WL 2788614, *1205 (D. Colo. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Anweiler v. American Electric Power Service Corporation*, 3 F.3d 986 (7th Cir. 1993). .33

*Bray v. Sun Life & Health Ins. Co. (U.S.)*, 838 F.Supp.2d 1183, 1195 (D. Colo. 2012),
appeal dismissed (June 1, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19, 26

*Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54 (4th Cir. 1992), cert denied 506 U.S. 1081 (1993)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dabertin v. HCR Manor Care, INc.*, 373 F.3d 822, 832 (7th Cir. 2004) . . . . . . . . . . . . 32

*Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . .18

*Glenn v. Metropolitan Life Ins. Co.*, 461 F.3d 660 (6th Cir. 2006), *aff'd* 554 U.S. 105 (2008)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758 (7th Cir. 2010) . . . . . . . . . . . . . . . . 26, 31, 32

*Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452 (7th Cir. Wis. 2010) . . . . . . . . . . . . .19

*Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823 (7th Cir. 2009) . . . 25, 26, 30

*Lifecare Mgt. Svcs., LLC, v. Ins. Mgt. Admins. Inc.*, 703 F.3d 835 (5th Cir. 2013) . . . . . 21

*Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . 25

*Ogden v. Michigan Bell Telephone Co.*, 595 F. Supp. 961 (E.D. Mich. 1984) . . . . . . . . .34

*Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621 (7th Cir. 2005). . .  32

*Shultz v. Blue Cross & Blue Shield of Kansas, Inc.*, 2011 WL 1118842 (D. Kan. Mar. 28, 2011)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Williams v. Metro. Life Ins. Co.*, 609 F.3d 622 (4th Cir. N.C. 2010) . . . . . . . . . . . . . . 26

*Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118 (9th Cir. 1998) . . . . . . . . . . . . . . 27

**Statutes**

29 U.S.C. § 1132. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. § 1002(21)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

29 U.S.C. § 1104(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the claims asserted by Plaintiff Duffy pursuant to 29 U.S.C. § 1132(e)(1).  Because Mr. Duffy's Medical Benefits Plan (hereafter "The Plan") was administered, in part, in this district, breach of that Plan took place in this district, and because Defendants do business in this district, venue in this Court is proper under 19 U.S.C. § 1132(e)(2).

## ISSUE PRESENTED FOR REVIEW

The sole issue before this Court is whether Defendants Sheffield, Olson, & McQueen, Inc. (hereafter "SOMI") and Farmers' Cooperative Association of Gillette, Wyoming (hereafter "FCA") acted arbitrarily and capriciously in denying Mr. Duffy's claims for benefits under The Plan.

## STATEMENT OF THE CASE

Plaintiffs Steven Duffy and Northern Rockies Neuro-Spine (NRNS) filed their First Amended Complaint on October 24, 2012 ("Complaint").  In the Complaint, Mr. Duffy brought two claims under the Employee Retirement Income Security Act of 1974 (hereafter "ERISA") against Defendants FCA and SOMI: 1) for recovery of employee medical benefits pursuant to 29 U.S.C. §1132(a)(1)(B); and 2) for equitable relief for breach of fiduciary duty pursuant to  29 U.S.C. §1132(a)(3).[1]

FCA filed its Answer on November 7, 2012, alleging as an affirmative defense that Bardon

---

[1] In the First Amended Complaint, Plaintiff NRNS also brought several claims against the Defendants, including declaratory judgment, promissory estoppel, and negligent misrepresentation.  This Court, in its Order on Initial Pretrial Conference, entered November 14, 2012, determined that Plaintiff Duffy's ERISA claims will be fully adjudicated before Plaintiff NRNS' claims are addressed by the Court. The Court confirmed the same in its order clarifying the scheduling order, entered April 13, 2013.

Insurance Group, Inc. would be responsible for payment of any amounts determined to be owing to Plaintiffs.   FCA filed a Third Party Complaint against Bardon Insurance Group, Inc. (hereafter "Bardon") and American National Insurance Company (hereafter "American National") on November 21, 2013, alleging that Bardon is the underwriter or administrator of a reinsurance policy provided by American to FCA and that one or both entities was liable for any monies owed to the First Party Plaintiffs.   Both Bardon and American National (collectively referred to hereafter as "Excess Carrier") denied any direct payment obligation to Mr. Duffy or to NRNS, or any involvement in Mr. Duffy's employee benefits plan.  SOMI filed its Answer on November 13, 2012 and a Motion to Dismiss on October 2, 2013.  The First Party Plaintiffs filed a timely Response in Opposition to SOMI's Motion to Dismiss on October 30, 2012.

Now, Mr. Duffy sets forth the merits of his argument for relief from the Defendants' denial of his claim for medical benefits pursuant to 29 U.S.C. 1132(a)(1)(B) and, in the alternative, for equitable relief as provided by 29 U.S.C. §1132(a)(1)(B).   As shown below, Defendants arbitrarily and capriciously denied Mr. Duffy's claims for benefits related to his low back and neck surgeries by approving Mr. Duffy's claims, only to deny them after FCA's stop-loss carrier denied coverage. As shown below, at all stages of Defendants' review, Defendants abused their discretion to interpret the plan and decide benefits, and in doing so, they violated their fiduciary duties to Mr. Duffy.

## STATEMENT OF FACTS

Mr. Duffy has been an employee of FCA since 2009, and has been continuously insured under the FCA Employee Medical Benefit Plan ("The Plan") since his employment began.

I.     PLAINTIFF DUFFY'S PRE-SURGERY MEDICAL CONDITION

Mr. Duffy has suffered from a continuous degenerative condition in his neck and low back and has received treatment at least since 1991. (SOMI 000134-000151, 000159-000167).   Mr. Duffy's symptoms were first documented by Dr. Kevin Schreiner, D.C., and included notes such as "[u]pper back and neck pain with radiation into right arm..." "His hand tingles when he raises it..." (SOMI 000164; Oct. 28-1991).

From 2000-2009, Mr. Duffy received chiropractic treatment for low back and neck pain from Todd Hildebrand, D.C.   (SOMI 000152-000158).   His physical complaints and symptoms continued to relate to either his neck or low back.   For example, in 2001, Dr. Hildebrand documented the following symptoms:   ". . . pain W-forward flex of C-spine, both index fingers numb..." (SOMI 000158).

Mr. Duffy's symptoms continued to worsen, as documented by Dr. Kim Maycock, D.C., his most recent chiropractor.  On Mr. Duffy's first visit to Dr. Maycock, she noted:

> The LB pain he feels today is severe and does radiate.  He says he is very sore in the mornings.  While he has had this and pains in the past his current symptoms are much more severe and unrelenting.  He also has bilateral arm parasthesias.  He has had an increase in symptoms over the past year.

(SOMI 000114).  Dr. Maycock's pre-surgery notes repeatedly refer to Mr. Duffy's neck and low back, and the fact that Mr. Duffy was suffering from radiating pain and parasthesias because of the severe problems in his neck and lower back.  (SOMI 000114-000131).

After seven visits to Dr. Maycock, and Mr. Duffy experiencing no improvement in his

condition, Dr. Maycock scheduled an MRI of the low back at the Campbell County Memorial

Hospital for Mr. Duffy.  That MRI study revealed:

> moderately severe L-5 S-1 spondylosis with disc osteophyte complex and
> moderately severe left occipital foraminal stenosis.  L-4/5 moderate
> spondylosis with moderately several foraminal osteophytic stenosis.  L-3/4
> mild spondylosis with moderate bilateral osteophitic foraminal narrowing.

(SOMI  000119).   Dr. Maycock summarized the results this way:  "This lumbar MRI 3/22/11

revealed serious degenerative changes in his LB which has resulted in foraminal narrowing/stenosis.

I have recommended consult with Dr. Schneider."  (SOMI 000120).   A cervical MRI done on

4/25/11 revealed "disc degeneration from C-5-C-7 with mild broad based disc

protusion/hypertrophic change at both levels.  Moderate to severe nerve root canal stenosis at C-6-

C-7 on the right as a result of uncoverterable joint hypertrophic change." (SOMI 000124).  As soon

as Dr. Maycock reviewed the radiology report of the MRI images, she told Plaintiff that he had

multiple levels of serious degenerative change in his neck and lower back, and she referred him to

Dr. John Schneider, M.D., a Board Certified Neuro-Surgeon, for further care and treatment.  (SOMI

000120).

     Following Dr. Maycock's recommendation, Plaintiff scheduled an appointment with Dr.

Schneider.  Dr. Schneider's clinical assessment on 4/29/2011 was:

> Patient has DDD (Degenerative Disc Disease) with chord and root
> compression at C-5/6 and C-6/7. We discussed this as well as the DDD at L-
> 5/S-1 for which we discussed ALF (Anterior Lumbar Fusion). The neck will
> take priority due to the root and chord involvement and **with his SX and
> failure of meds and PT, we would suggest ACDF** (Anterieral Cervical
> Discectomy Fusion) **at C-5-6-7**.

4

(SOM 000067).  (Emphasis added).  In making his clinical assessment, Dr. Schneider reviewed Mr.

Duffy's medical history, and on 04/08/2011, made the following observations regarding Mr.

Duffy's low back pain:

> **Onset: 15 years ago...the problem is worsening, it occurs persistently.
> Location of pain was lower back and thighs.  Pain has radiated to the left
> thigh and right thigh.**  The patient describes the pain as an ache, burning,
> deep, discomforting, numbness, sharp shooting and throbbing.  Symptoms are
> aggravated by ascending stairs, changing positions, daily activities, descending
> stairs, extension, lifting, lying/rest, pushing, rolling over in bed, sitting,
> sneezing, standing, twisting and walking...

(SOM 000054).  (Emphasis added).  Regarding Mr. Duffy's neck pain, Dr. Schneider further noted:

> The severity of the problem is moderate.  **The problem has worsened.  The
> frequency of pain is constant**.  Location of pain is bilateral head, bilateral
> posterior neck, bilateral shoulder, bilateral arm and bilateral upper neck.  There
> was radiation of pain to the bilateral upper arm, bilateral interscapular and
> bilateral hand.  The patient describes the pain as aching, discomforting,
> piercing and shooting.

*Id.*  (Emphasis added).  After additional MRIs, and consultations, Mr. Duffy, relying upon the

advice and counsel of Dr. Schneider, decided to have surgery on his neck and lower back.  Before

scheduling surgery, both Plaintiff and Dr. Schneider's office, as required by The Plan, made

telephone calls to First Choice of Midwest Insurance Company (hereafter "First Choice")/SOMI, to

notify The Plan of Mr. Duffy's pending surgeries and obtain pre-authorization.[2]  Plaintiff and Dr.

Schneider's medical assistant were both told by the First Choice claim representative that pre-

---

[2]The Plan sets forth the requirements for Hospital Notification, including an express directive that the Covered
Person shall call the number printed on his ID card to complete Hospital Notification. (SOM 000192-000193).  The
numbers printed on Mr. Duffy's ID card are for both SOMI and First Choice.  (SOM 000446).

authorization for these surgeries was not necessary because it was an out-patient surgery. The insurance claim representative also told them that Mr. Duffy had "a $3,000 deductible, after which we will pay 100%." (SOMI 000293, recorded call with Dr. Schneider's office).[3]

II.    SOMI AND FCA APPROVED AND PAID CLAIM

On May 9, 2011, Plaintiff had surgery on his neck and lower back.[4]  Thereafter, Plaintiff's various health care providers submitted the bills for this procedure to SOMI for payment.[5]  The bills were approved for payment by SOMI, the Contract Administrator, and by FCA, the Plan Sponsor, as further discussed below. Then, in accord with its duties under The Plan and its Administrative Services Agreement with FCA, SOMI paid Dr. Schneider's bills, in the full aggregate amount of $39,717.92, on May 26, 2011. (SOMI 000374-375).

**A.    Defendants approved Mr. Duffy's claims as Pre-service Claims or Post-Service Claims.**

The Plan identifies certain requirements that must be met for a claim to be considered a Pre-Service Claim, which is approved prior to surgery. (SOM 000203). Here, both Mr. Duffy and

---

[3] This recording is on a DVD, which is being mailed separately to the Court.

[4] Anterior lumbar discectomy and reconstruction L5-S1 and an Anterior cervical discectomy and reconstruction C5-6, Anterior discectomy and reconstruction C6-7; SOMI 000010-000013.

[5] The bills Mr. Duffy incurred for his surgeries on May 9, 2011 included:
    Co Surgeon 1 - Schneider MD        $15,795.12
    Asst Surgs - Welch/Morell          $ 4,805.68
    Surgeon-Schneider MD               $19,117.12
    Co-Surgeon2 - Welch MD             $ 8,539.44
    West Park Hospital                 $63,140.22

NRNS contacted the numbers on Mr. Duffy's insurance card to advise Mr. Duffy's insurance company of the scheduled surgery and acquire pre-approval. Presumably, Mr. Duffy's claims were pre-approved as Pre-service claims. But, even if SOMI can prove some procedural defect that would persuade the Court that Mr. Duffy's May 9, 2011 surgeries were not approved Pre-service claims, his claims also met all requirements for approved Post-service claims. If considered Post-service claims, they were approved no later than August 17, 2011 because neither SOMI nor FCA denied Mr. Duffy's claims before that date. (SOM 000201-0000203).

**B.** **Defendants approved and paid Mr. Duffy's surgery bills for Dr. Schneider's services in accord with the FCA-SOMI agreement.**

The Plan benefits are self-funded by FCA and are paid from FCA's general assets. (SOM 0000219). FCA, as the Plan Sponsor, "is responsible for the financing and administration of the Plan." *Id.* But, SOMI provides administrative services to FCA, including payment of claims. (SOM 000220; 000447-000485).[6] As described in an agreement between FCA and SOMI, which was disclosed in discovery pursuant to a protective order (hereafter "ASA"), SOMI pays claims on FCA's behalf. (SOM 000454).[7] Because SOMI also has discretion to decide claims (SOM 000203, 000204; 000448), unless FCA *promptly* notifies SOMI that it disapproves of SOMI's approval or payment decision, claims are approved and paid out without FCA's involvement (SOM 000454).[8]

---

[7] The ASA may be filed with this Court as a sealed Exhibit, pending this Court's order, and is Bates stamped SOM 000448 through SOM 000485.

[8] But, note that FCA expressly retains ultimate authority to decide claims and interpret The Plan's provisions, should it choose to exercise that authority. (SOM 000220; 000451).

Here, the Administrative Record shows that SOMI approved all surgery-related claims, and paid Dr. Schneider's claims on behalf of FCA.  (SOM 000036).  The Record does not contain any evidence showing FCA's prompt disapproval of payment.  Only when SOMI/FCA learned that its Excess Carrier was denying the claim, did SOMI/FCA change their position.

### III.   FCA'S EXCESS CARRIER DENIES CLAIM; SOMI/FCA DENIES CLAIM

In its Answer and Third Party Complaint, as well as in documents produced in discovery, FCA references its Treaty of Excess Loss Reinsurance, issued by Excess Carrier.  Excess Carrier is not a party to The Plan, nor directly obligated to Mr. Duffy for payment of his medical benefits claims under The Plan (*see* Answers of Third Party Defendants).  Yet, Excess Carrier's decision to deny Mr. Duffy's claim caused SOMI/FCA to deny Mr. Duffy's surgery claims and demand repayment of the $39,717.92 paid to Dr. Schneider.  (SOM 000037, 000389-000398).

As explained by SOMI in its Answer, after it paid Dr. Schneider's claims on May 26, 2011, it learned on June 28, 2011, that Excess Carrier had denied stop-loss coverage.  *See,* SOMI's Answer, First Counterclaim, ¶¶ 8-9.[9]  On June 29, 2011, SOMI issued a letter to Dr. Schneider explaining that Excess Carrier had denied stop-loss coverage for NRNS' claims.  *Id.* at ¶ 10.  (SOM 000037).  SOMI's letter explained that Excess Carrier had asked Medical Review Institute of America (hereafter "MRIoA") to review Mr. Duffy's claims, and MRIoA had determined the

---

[9]One of SOMI's administrative roles is to assist FCA in the submission of claims for benefits payable under stop-loss insurance coverage.  (SOM 000451).

surgeries where "*not* medically indicated." *Id.*[10]  SOMI asked Dr. Schneider to provide a narrative and further records, so that it could "forward this to the stop loss carrier, who will initiate an appeal with the outside reviewer (MRIoA)." *Id.*

The following fact is critical: SOMI's June 29, 2011 request to NRNS for a narrative and additional records was not made in an effort to determine "medical necessity" under The Plan so that SOMI or FCA could decide Mr. Duffy's claims.  *Id.*  Rather, when SOMI made its request to NRNS on June 29, 2011, it was wearing a different hat: that of FCA's stop-loss coverage facilitator. Thus, MRIoA's initial review of Mr. Duffy's surgery claims was to determine whether FCA's Excess Carrier would provide stop-loss coverage under the terms of the Treaty between FCA and Excess Carrier, *not The Plan*.  Just as Excess Carrier is not a party to The Plan, Mr. Duffy is not a party to the stop-loss treaty.  Neither Mr. Duffy nor NRNS had any obligation under The Plan to provide any additional information to SOMI to aid FCA in obtaining stop-loss coverage for Mr. Duffy's claims.  And, Excess Carrier's approval of stop-loss coverage is not a condition precedent to determination of medical necessity under The Plan.

Nevertheless, on July 18, 2011, NRNS responded to SOMI's June 29 letter with a narrative. (SOM 000039).   The next day, July 19, 2011, SOMI shared the contents of NRNS' letter with Excess Carrier.  (SOM 000042).  Instead of forwarding Dr. Schneider's narrative on to MRIoA for

---

[10]  The letter references MRIoA's June 24, 2011 review of Mr. Duffy's surgeries, which was performed on behalf of Excess Carrier.  (SOM 000031).  This review was based on *only* these documents: Case Notes 6/15/2011; HICF billings 5/9/2011; Operative reports 5/9/2011; Encounter notes 4/29/2011, 4/27/2011, 4/8/2011; and the report from Lumbar MRI, 3/22/2011.  This review did *not* consider The Plan language.

appellate consideration, Excess Carrier considered the narrative internally and relied on MRIoA's

June 24, 2011 decision.  (SOM 000041; 000042).   Excess Carrier replied to SOMI later the same

day, stating that the claims were denied as not medically indicated. *Id.*

On July 22, 2011, AllMed Healthcare Management (hereafter "AllMed") reviewed Mr.

Duffy's surgery claims on behalf of SOMI.[11]  AllMed considered several, but not all, of the medical

reports which SOMI forwarded to Excess Carrier for MRIoA's first review.[12]   (SOM 000043).

AllMed concluded that Mr. Duffy's surgeries were not medically necessary because:

> The medical reports submitted for review showed no evidence of any
> instability of the spine in either the cervical or lumbosacral region . . . Without
> evidence of instability, myelopathy, a fracture, a tumor, spondylolisthesis, or
> marked decreasing function, the procedures cannot be deemed medically
> necessary . . . the symptoms of the lumbosacral spine were relieved by
> massage in the 4/8/2011 note . . .

(SOM 000044).

Although the records reviewed by AllMed were not complete, neither SOMI nor FCA ever

asked Mr. Duffy or NRNS to provide additional records for *SOMI's* review of Mr. Duffy's

eligibility for benefits under The Plan.  (*See,* Administrative Record, showing lack of any such

correspondence).  The Administrative Record does not even show SOMI ever sharing the results of

AllMed's July 22, 2011 review, or any statement adopting AllMed's conclusion with either Mr.

---

[11]This is the first review requested by SOMI to determine "medical necessity" as defined in The Plan.

[12]Among the documents considered by MRIoA on June 24, 2011 but not considered by AllMed on July 22, 2011 include: 1) Case notes 6/15/2011; 2) Encounter notes for 4/29/2011 and 4/27/2011.  AllMed also considered the following additional documents, which were not considered by MRIoA: Cervical MRI report 4/25/2011, and Plan language.  Neither reviewer considered Dr. Schneider's narrative.

Duffy or NRNS.  *See, id.*

On September 28, 2011, SOMI sent overpayment letters to NRNS, requesting a refund of the amounts paid out.  *See,* SOMI's Answer, First Counterclaim, ¶ 13.  In response, Dr. Schneider wrote another letter to SOMI describing why the surgeries were medically necessary, and, on February 22, 2012, NRNS provided additional information to SOMI and asked SOMI to reprocess its claims.  (SOM 000051; 000052).

On March 13, 2012, MRIoA rendered another opinion on Mr. Duffy's claims; this time for SOMI rather than for Excess Carrier.  (SOM 000092). To generate its report, MRIoA considered its June 24, 2011 decision and the documents it considered at that time, plus the following additional documents: 1) surgeon, co-surgeon and assistant surgeon fee chart; 2) Letter from Marcie Hobbs, CPC, dated 2/22/2012; 3) Letter from John H. Schneider, MD, dated 2/17/2012; 4) Encounter notes 1/24/12, 8/26/11, 6/17/11; 5) Letter from Kim Maycock, DC, dated 11/21/2011; and the 6) Cervical MRI report 4/25/2011.  (SOM 000031, 000092).  MRIoA concluded:

> **Based on the clinical information submitted for this review and using the evidence-based, peer-reviewed guidelines referenced below** [lists references supporting decision], the request for anterior cervical discectomy and fusion is **not considered reasonable or necessary** and the request for lumbar discectomy and fusion is **not considered medically necessary or appropriate**.

(SOM 000096 – 000097).  MRIoA explained its rationale:

> Medical records do not demonstrate significant radicular findings on the clinical exam in the lumbar spine and demonstrate exhaustion of conservative care or identification of all pain generators in the cervical and lumbar spine

11

prior to going to surgery.[13]   **Therefore, the request is not medically necessary.  This is an appeal as these procedures have been reviewed previously.**   The previous review indicated that these medical procedures were not considered medically indicated as there was documentation that the MRI and examination were incongruent on the upper extremity and there was a lack of documentation to demonstrate which level in the lumbar spine was producing his low back pain.   There was also evidence of a lack of radiculopathy.   **As such, the review previously determined that these procedures were not medically necessary.**   This review on this date is in agreement…

(SOM 000097).  (Emphasis added).

SOMI notified NRNS of MRIoA's findings on March 22, 2012, in a letter which explained that "[t]his request has now been reviewed with regard to the coverage available within the terms of the group medical plan through Farmer's Cooperative Association."  (SOM 000100). But, notice that The Plan, or its definition of "medical necessity," is *not* listed among the documents considered by MRIoA.  (SOM000092).   SOMI further explained that because MRIoA had determined Mr. Duffy's surgeries to be not medically necessary, Mr. Duffy's surgeries were determined to be outside of The Plan's coverage. (SOM 000100).

Mr. Duffy timely appealed SOMI's denial on May 11, 2012.  (SOM 000106-000110).  With his appeal, Mr. Duffy provided additional information and all of his chiropractic records (38 pages from Gillette Chiropractic Center and 21 pages from Chiropractic Wellness Center) since 1991.  (SOM 000111-000196).

---

[13]   The report states previously that, "[t]he medical records failed to indicate any significant conservative care given to this patient prior to the surgeries.  The first clinical note provided for this review other than the imaging studies was on 4/8/2011; 1 month later the patient was taken to surgery."  Given MRIoA's conclusion, presumably it meant to state that in its opinion, the medical records did *not* demonstrate exhaustion of conservative care.

On May 24, 2012, SOMI asked MRIoA to perform a third review of Mr. Duffy's claims to determine whether the surgeries performed on 5/9/2011 were "medically appropriate, medically necessary, and followed standards and protocols." (SOM 000170-000178). MRIoA again found that neither surgery was "considered reasonable and necessary." (SOM 000174). This time, MRIoA admitted that Mr. Duffy had gone through conservative care, but found new discrepancies in the medical records to support its previous position that the surgeries were not "reasonable and necessary." *Id.* SOMI adopted MRIoA's conclusion and issued a final denial letter to Mr. Duffy on June 13, 2012. (SOM 000176; 000179-000181).

Excess Carrier's "Explanation of Payment" document, shows the mathematics behind SOMI's belated denial of Mr. Duffy's claims. It shows that FCA's deductible on its stop-loss insurance through Excess Carrier is $30,000.00. (SOM 000036). SOMI had already paid $39,717.92 to NRNS before Excess Carrier denied stop-loss coverage. *See,* SOMI's Answer, First Counterclaim, ¶¶ 8-9. Thus, without coverage from its stop-loss carrier, under The Plan, FCA would have been responsible for paying another $83,491.16 out of its own coffers – unless Defendants adopted Excess Carrier's decision that the surgery was not "medically necessary." *Id.* And, they did.

V.     FCA FAILS TO REVIEW CLAIM; ADOPTS BARDON'S DENIAL

FCA has "final authority" in making claims decisions and interpreting the Plan. (SOM 000220; 000451). Yet, FCA stated in paragraph 4 of its Answers to Interrogatories, dated March 4, 2013, and attached hereto as **Exhibit "A"**, that "FCA had no input in the decision regarding

Duffy's claim.  FCA became aware of the denial by Bardon in a telephone call from SOMI about Bardon's decision."  FCA did not review the claim, or assess medical necessity, and is not even familiar with the basic facts regarding the claim.  *See*, FCA's Answer (stating a general lack of knowledge about Mr. Duffy's claim).  It is clear that FCA had authority to deny, but approved Mr. Duffy's surgery claims and approved payment of NRNS' claims through acquiescence.  FCA deferred to SOMI, which deferred to Excess Carrier and "independent reviewers," which decided medical necessity without comprehensive review and on grounds not stated in The Plan.

If FCA, SOMI, and the Excess Carrier are successful in their scheme to deny this claim, Plaintiff will be faced with medical bills in the amount of $129,632.06, for which he has no ability to pay.  (SOM 000340-343). This under circumstances where FCA and SOMI approved payment for the claims and actually paid NRNS the amount for which they were obligated to pay under the stop-loss treaty. (SOM 000036).

## SUMMARY OF ARGUMENT

SOMI and FCA acted arbitrarily and capriciously by deferring to Excess Carrier's erroneous conclusion rather than exercising their own discretion to interpret The Plan's definition of "medically necessary" in accord with the Plan's plain language and their fiduciary duties.  Then, the Defendants acted arbitrarily and capriciously by denying coverage for Mr. Duffy's surgery bills and demanding repayment from NRNS when doing so was unreasonable and only furthered their own financial interests.  Because SOMI and FCA made these decisions while operating under a conflict of interest, their decision to deny Mr. Duffy's claim must be given less deference than would be

14

afforded where the fiduciary or plan administrator does not have a financial interest at stake. Finally, Mr. Duffy should be awarded attorney's fees, as provided in 29 U.S.C. § 1132(g)(1), and further discussed below.

### STANDARD OF REVIEW

A court reviewing an administrator or fiduciary's denial of employee benefits under 29 U.S.C. §1132(a)(1)(B) applies an "arbitrary and capricious" standard to a plan administrator's actions where, as here, the administrator has discretionary authority to determine eligibility for benefits or to construe the plan's terms. *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1119 (10th Cir. 2006), *citing*, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). *See, also*, *McGraw v. Prudential Ins. Co. of America*, 137 F.3d 1253, 1259 (10th Cir. 1998).[14]   The reviewing court considers the record as a whole to determine whether the decision to deny was made arbitrarily and capriciously. *Rekstad*, 451 F.3d at 1119.  A decision to deny benefits is arbitrary and capricious if the decision is not a reasonable interpretation of the plan's terms.  *McGraw,* 137 F.3d at 1259, *citing, Semtner v. Group Health Serv. of Okla.,* 129 F.3d 1390, 1393(10th Cir. 1997); *Torix v. Ball Corp*., 862 F.2d 1428, 1429 (10th Cir. 1988). "Evidence of arbitrary and capricious actions include a mistake of law, bad faith and lack of substantial evidence."  *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 380 n. 4 (10th Cir.1992).

The Tenth Circuit Court of Appeals has recognized that the arbitrary and capricious standard

---

[14]In the ERISA context in the Tenth Circuit, the arbitrary and capricious standard is equated with the abuse of discretion standard; there is a semantic, not substantive, difference between the terms. *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 825 n. 1 (10th Cir.1996).

is inherently flexible, providing for less deference to be afforded to an administrator's decision under certain circumstances. *McGraw*, 137 F.3d at 1258; *Rekstad*, 451 F.3d at 1120. The amount of deference "is lessened in varying degrees if there exists a conflict of interest between the administrator's duty to act in the interest of the plan participant and the administrator's self interest or loyalty to his employer." *Rekstad*, 451 F.3d at 1120. For example, an administrator acts under an inherent conflict of interest when the plan administrator is also the insurer or the plan, *see, DeGrado v. Jefferson Pilot Financial Ins. Co.,* 451 F.3d 1161, 1167–68 (10ᵗʰ Cir.2006), when the administrator both evaluates and pays claims, *see, Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231-32 (10ᵗʰ Cir. 2012), or when the administrative has a financial interest in denying claims, *see, McGraw*, 137 F.3d at 1259, 1263. In such cases, the conflict is weighed as a factor in determining whether there was an abuse of discretion. *Shultz v. Blue Cross & Blue Shield of Kansas, Inc.*, 2011 WL 1118842 (D. Kan. Mar. 28, 2011), citing, *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 115, 128 S.Ct. 2343 (2008).

Where the administrator operates under a conflict of interest, such as in Mr. Duffy's case, that conflict is weighed "as a factor in determining whether the plan administrator's actions were arbitrary and capricious." *Foster,* 693 F.3d at 1231-32 (10th Cir. 2012), quoting, *Charter Canyon Treatment Ctr. v. Pool Co.,* 153 F.3d 1132, 1135 (10ᵗʰ Cir.1998). In such cases, courts apply

> **a combination-of-factors method of review that allows judges to take account of several different, often case-specific, factors, reaching a result by weighing all together**." [W]e will weigh the conflict of interest as a factor

in our abuse of discretion analysis, and we will weigh it more or less heavily
depending on the seriousness of the conflict."

*Foster,* 693 F.3d at 1231-32.  (Emphasis added, internal citations and quotations omitted).  Thus, in

a case such as this, the amount of deference given to the administrator's denial decision decreases

on a sliding scale "to the degree necessary to neutralize any untoward influence resulting from an

administrator or fiduciary's conflict of interest."  *Rekstad*, 451 F.3d at 1120; *McGraw*, 137 F.3d at

1259.

## ARGUMENT

I.      DEFENDANTS ARBITRARILY AND CAPRICIOUSLY DENIED DUFFY'S
        CLAIMS

   A.  **Defendants arbitrarily and capriciously denied Mr. Duffy's claim by failing
       to fulfill their fiduciary duties when interpreting The Plan and deciding
       benefits.**

FCA and SOMI are fiduciaries, charged with reasonably exercising their discretion to

interpret The Plan and decide claims.  Despite SOMI's attempt to disavow its status as a fiduciary,[15]

the Plan terms identify SOMI by name as the Contract Administrator, and identify the Contract

Administrator as a fiduciary for purposes of interpreting the Plan:

> Any interpretation or determination made under discretionary authority to interpret
> the terms of the Plan and to determine eligibility and entitlement to Plan benefit
> which shall be given to the **Contract Administrator, the Plan Administrator, and
> other Plan fiduciaries** and individuals to whom responsibility for the administration
> of the Plan has been delegated…

(SOM 000192).  (Emphasis added).  In addition, and regardless of the language contained in the

17

Plan, an entity is a fiduciary for ERISA purposes when it exercises discretionary authority or discretionary control over the management of a plan, or has discretionary authority or responsibility in the administration of the plan.  29 U.S.C. §1002(21)(A).  In this regard, the statute provides:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) **he exercises any discretionary authority or discretionary control respecting management of such plan** or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has **any discretionary authority or discretionary responsibility in the administration of such plan**. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. §1002(21)(A) (emphasis added).

A fiduciary duty under ERISA is "not an all-or-nothing concept."  *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992), cert. denied 506 U.S. 1081 (1993).  Rather, under 29 U.S.C. § 1002(21)(A), a court may find that an entity or person is a fiduciary with respect to a particular activity but is not a fiduciary with respect to other activities which do not bring him within the definition.  *Id.*; *Donovan v. Mercer,* 747 F.2d 304, 308 (5th Cir.1984) *citing*, House Conference Rep. No. 93-1280, 93d Congress, 1974 U.S. Code Cong. and Ad. News 4639, 5038, 5103 (concluding that based on the ERISA's legislative history, "fiduciary" should be defined not only by reference to particular titles, "but also by considering the authority which a particular person has or exercises over an employee benefit plan.").

Here, SOMI is a fiduciary because The Plan documents identify it, the Contract

---

[15] *See,* SOMI's Motion to Dismiss*, generally.*

Administrator, as a fiduciary and grant it the authority and responsibility to decide Plaintiff Duffy's claim. The ASA further demonstrates that FCA delegated to SOMI the duty of determining medical necessity under The Plan, so SOMI is a fiduciary with regard to that duty. FCA is a fiduciary because as the Plan Sponsor and Plan Administrator, it retains overriding discretion over plan interpretation and payment of benefits.

"ERISA commands undivided loyalty to plan participants." *McGraw*, 137 F.3d at 1263. It requires fiduciaries to act *solely* in the interests of plan participants when exercising their discretion to determine a plan participant's eligibility for benefits. *Id.*; *Bray v. Sun Life & Health Ins. Co. (U.S.)*, 838 F.Supp.2d 1183, 1195 (D. Colo. 2012), appeal dismissed (June 1, 2012), *quoting* 29 U.S.C. § 1104(a)(1) (an administrator, as a fiduciary, "must discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries .....").

FCA and SOMI breached their fiduciary duties by failing to reasonably interpret The Plan and failing to decide Mr. Duffy's benefits claims in his sole interest. First, SOMI breached its fiduciary duties to Mr. Duffy by representing that he had health insurance coverage for his surgeries and, then, after Excess Carrier denied his claim, denying his claims and demanding repayment from NRNS. *See, e.g.*, *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 456 (7th Cir. Wis. 2010) (finding insurer violated its fiduciary duty by instructing the insured to call customer service representative to determine whether a certain surgery was covered, but failed to tell insured that the customer service representative's approval was not a binding answer, and failed to tell insured how

19

to obtain a binding answer before having surgery).  Next, SOMI breached its fiduciary duties by characterizing Mr. Duffy's surgeries as not medically necessary without evaluating them under The Plan's language.  SOMI further breached its duties by discounting the evidence of the severity of Mr. Duffy's condition, by ignoring medical opinions including that of Dr. Schneider, a board-certified neurosurgeon, and by relying only on medical authorities which supported the denial decision.  Finally, both SOMI and FCA breached their fiduciary duties by relying on MRIoA to decide medical necessity, and allowing MRIoA's reviews of Mr. Duffy's claims to be tainted by its prior reviews, including one review on behalf of Excess Carrier.  *See, e.g. Varity Corp. v. Howe*, 516 U.S. 489 (1996) (recognizing that there is more to plan administration than simply complying with the specific duties imposed by the plan documents…the primary function of fiduciary duty is to *constrain the exercise of discretionary powers* which are controlled by the fiduciary duty).

FCA violated its fiduciary duties to Mr. Duffy by failing to monitor SOMI's actions or insure compliance with The Plan.  When Excess Carrier denied Mr. Duffy's claim, FCA's interest in denying Mr. Duffy's claims emerged.  FCA allowed that interest to override its duty to act in the interest of Mr. Duffy, the plan participant. FCA also allowed SOMI, acting on its behalf, to advocate for its interests in gaining stop-loss coverage, when that role detracted from SOMI's ability to neutrally assess and decide Mr. Duffy's claims.  Defendants' multiple violations of their fiduciary duties to Mr. Duffy are some of the ways they acted arbitrarily and capriciously in denying Mr. Duffy's claims.

**B.** **Defendants arbitrarily and capriciously denied Mr. Duffy's claim by unreasonably interpreting plain language of The Plan's definition of Medically Necessary.**

In its March 22, 2012 claim denial letter, SOMI wrote to NRNS: "[w]hile we do not prefer to decline benefits, **the plan provisions and limitations must be administered as written**." (SOM 000102). (Emphasis added). Mr. Duffy agrees. As stated by the Tenth Circuit Court of Appeals, "[q]uestions involving the scope of benefits provided by a plan to its participants must be answered initially by the plan documents, applying the principles of contract interpretation." *Chiles v. Ceridian Corp.,* 95 F.3d 1505, 1515 (10th Cir.1996). The language of an ERISA plan should be given "its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Id.* at 1511. If a fiduciary or administrator "interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations." *Lifecare Mgt. Svcs., LLC, v. Ins. Mgt. Admins. Inc.*, 703 F.3d 835, 841 (5th Cir. 2013).

After its initial approval, every time SOMI reported to Mr. Duffy or NRNS that the surgery claims had been denied, SOMI supported its position with an evaluation from an "independent medical reviewer." The final review (and all but one review in total) was performed by MRIoA. None of MRIoA's reviews analyzed Mr. Duffy's claim according to the definition provided in The Plan, which states:

> **Medically Necessary** – Services and supplies provided to a covered person which, *in the judgment of the Plan Sponsor*, (a) are appropriate and consistent with the diagnosis or treatment of the Illness, and (b) are customarily and reasonably recognized as appropriate throughout the Physician's profession, and (c) could not have been omitted without adversely affecting the patient's condition or quality of medical care rendered, and (d) are not solely for the convenience of a Covered Person, Physician, Hospital, or other provider.

(SOM 000229). (Emphasis added). In fact, the Administrative Record shows that MRIoA never listed The Plan as a document considered in reviewing the claims. (SOM 000031– 000035; SOM 000092 – 0000100; 0000170 – 0000178).

Even when The Plan's definition was provided, for the May 24, 2012 review, MRIoA ignored The Plan's definition and used its own references and guidelines to determine whether the treatment was "reasonable and necessary;" the same grounds upon which it performed the earlier evaluations.[16] MRIoA's May 2012 report demonstrates that it made its decision on its own references – not based on The Plan. (SOM 000176, stating, "[b]ased on the clinical information submitted for this review and using the evidence-based, peer-reviewed guidelines referenced below…"). By accepting MRIoA's conclusion, even though MRIoA did not evaluate Mr. Duffy's claims under The Plan, SOMI arbitrarily and capriciously ignored The Plan's plain language and used MRIoA's definition instead.

    **C.**    **Defendants arbitrarily and capriciously denied Mr. Duffy's claim by adding additional conditions to narrow the scope of The Plan's definition of Medically Necessary.**

---

[16]Similarly, when AllMed reviewed Mr. Duffy's claim, it failed to determine medical necessity based on The Plan's language.

It is abuse of discretion for an insurer, charged with the ability to determine whether a claimant's condition meets the plan's definition of "medical necessity," to add an additional requirement to the definition set forth in the plan. *See*, *McGraw*, 137 F.3d at 1260 - 1262.  In *McGraw*, the court found the administrator to have abused its discretion by narrowing the scope of the term "medical necessity" as defined in the insured's medical benefits plan, when it added the additional condition that the insured's condition must be able to be improved by the treatment for the treatment to be covered, when "significant progress" was not plainly stated in the plan's definition of medical necessity.  *Id.*

Here, The Plan contains a four-part test for determining medical necessity.  (SOM 000229). The Plan does not contain a provision that allows SOMI/FCA to deny a Covered Person's claim if the claim is denied by FCA's excess carrier.  It also lacks a provision allowing SOMI/FCA's review of a Covered Person's claim to be influenced by the claim determination made by FCA's excess carrier.  Defendants unreasonably narrowed the scope of The Plan's definition of Medical Necessity by adding the additional requirement that claims are decided to be medically necessary only if Excess Carrier decides, in its discretion, that the claim is medically indicated.  Defendants further narrowed The Plan's definition by requiring the reviewer who decided Excess Carrier's claim to find "medical necessity" under The Plan, and, in its *appellate capacity*, already having reviewed the claim for Excess Carrier.  Significantly, in its first review for SOMI to determine whether Mr. Duffy's surgeries were medically necessary under The Plan, MRIoA ignored The Plan's four part test, and stated:

23

> This is an appeal as these procedures have been reviewed previously...the review previously determined that these procedures were not medically necessary...this review on this date is in agreement with the previous review.

(SOM 000097).   In subsequent reviews, rather than getting an independent evaluation of medical necessity, as defined in The Plan, Defendants relied on *another* evaluation by MRIoA to support their final decision revoke approval of Mr. Duffy's claims.  The final letter from SOMI, based on MRIoA's May 24, 2012 review, states, "... "the original claim determination remains unchanged." (SOM 000181).

Another requirement Defendants added to The Plan's definition of Medical Necessity is that the determination must be made based on physician's notes and written records, alone, and must be determined by a MRIoA reviewer from the written records provided to MRIoA within 24 hours of request.  (SOM 000399 – 000402).   Unlike other cases where the administrator made a thorough investigation of the participant's claim, by talking to physicians, examining the patient, or simply reviewing the evidence *itself*, neither SOMI nor FCA, nor their agents took any of these steps. *Contra, Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009) (finding no abuse of discretion where administrator diligently endeavored to discover the nature of claimant's ailments, routinely requested updated medical records, and conducted its own clinical reviews of these records).

> **D. Defendants arbitrarily and capriciously denied Mr. Duffy's claim because their decision to deny Mr. Duffy's claim, after they had approved it, was not supported by substantial evidence.**

As stated by the Tenth Circuit Court of Appeals:

> A decision is arbitrary and capricious if it is unsupported by substantial evidence. *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 382 (10th Cir.1992). "'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].' Substantial evidence requires 'more than a scintilla but less than a preponderance.' " *Id.* (citations omitted) "**Substantiality of the evidence is based upon the record as a whole. In determining whether the evidence in support of the administrator's decision is substantial, we must take[ ] into account whatever in the record fairly detracts from its weight**." *Caldwell,* 287 F.3d at 1282 (internal quotation marks omitted).

*Buckardt v. Albertson's, Inc.*, 221 F. App'x 730, 734 (10th Cir. 2007) (Emphasis added); *Rekstad*, 451 F.3d at 1119, *citing, Caldwell Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).

Selective consideration of evidence is a "hallmark of an arbitrary and capricious decision." *Holmstrom v. Metro. Life Ins. Co.,* 615 F.3d 758, 777 (7th Cir. 2010), *citing, Majeski v. Metropolitan Life Ins. Co.,* 590 F.3d 478, 483–84 (7th Cir.2009) (holding that denial decision was arbitrary where insurer selectively relied on pieces of evidence to support denial of benefits, while that evidence in context demonstrated disability); *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 832-833 (7th Cir. 2009) (denial decision was arbitrary where insurer "cherry-picked the statements from her medical history that supported the decision to terminate her benefits, while ignoring a wealth of evidence to support her claim that she was totally disabled"); *see also, Glenn v. Metropolitan Life Ins. Co.,* 461 F.3d 660, 672–74 & n.4 (6th Cir.2006) (holding denial decision was arbitrary where plan selectively considered evidence to reach decision unsupported by the record as a whole), *aff'd* 554 U.S. 105 (2008) (approving Sixth Circuit's reasoning).

In *Holmstrom v. Metro. Life Ins. Co.*, the Court found that the benefit denial was arbitrary and capricious when the insurer focused too much on the lack of objective evidence of disability and ignored the ample evidence that the insured was disabled by pain. 615 F.3d at 777.  There, the court faulted the plan for "cherry-picking" the medical evidence and ignoring test results inconsistent with its finding of lack of disability.  *Id.  See also, Williams v. Metro. Life Ins. Co.*, 609 F.3d 622 (4th Cir. N.C. 2010) (finding insurance company's denial of LTD benefits an abuse of discretion when evidence of disability was overwhelming and the insurer relied on a "scintilla" of evidence in denying benefits: a single report that the claimant reported having good days and bad days, and had pain of three on a ten-point scale); *Leger,* 557 F.3d at 832–33 (finding the Plan cherry-picked the statements from participant's medical history that supported the decision to terminate benefits, while ignoring a wealth of evidence to support participant's claim that she was totally disabled).

The Administrative Record shows that SOMI/FCA "cherry-picked" the evidence to support denial in the following ways.  First, SOMI requested a "narrative" from Dr. Schneider but never considered the letter in any determination of medical necessity.  (SOM 000037, 000039).  Second, SOMI and its agent, MRIoA, were arbitrarily dismissive of Dr. Schneider's opinion regarding the necessity of Mr. Duffy's surgeries.  As recently stated by the District Court for the District of Colorado, "[t]reating physicians might tend to support their patients' disability claims. However, that is no excuse for ignoring them..."  *Bray,* 838 F. Supp. 2d at 1195.  If a plan is "suspicious of the bona fides of the opinions" of the treating physician, it should obtain its own medical information.

26

*Id.*   But, SOMI/FCA never had Dr. Schneider re-examined, never followed up with NRNS regarding the alleged discrepancies in the medical records, and never conducted any investigation. An administrator cannot reject evidence supporting a claim "without a sufficient evidentiary basis for doing so." *Id.*, *citing, Zavora v. Paul Revere Life Ins. Co.,* 145 F.3d 1118, 1123 (9th Cir.1998). Here, The Plan did not have a sufficient evidentiary basis to reject the treating physicians' medical opinions, and therefore Defendants arbitrarily and capriciously rejected their opinions without sufficient evidence. *See, id.*

Had Defendants given due consideration to Dr. Schneider's letters, to Kim Maycock's letter, to Mr. Duffy's narratives, and to the records as a whole, they would have had substantial evidence to support the medical necessity of Mr. Duffy's surgeries.  In Mr. Duffy's case, The Plan sets out a four-part test to determine medical necessity. First, The Plan requires treatment to be appropriate, given the diagnosis.   MRIoA's reviews for SOMI were limited to the notes made in medical records.  Not only did SOMI discredit treating physicians' opinions without an evidentiary basis for doing so, it failed to acknowledge all the evidence. For example, in its March 22, 2012 denial letter, SOMI said this: "...there does not appear documentation of pain generators being identified and treated for the lumbar spine prior to going to surgery."  Again, and contrary to that statement, Plaintiff's pre-surgical chiropractic records made it very plain that he was experiencing a significant amount of pain and disability for years before finally consulting with Dr. Schneider for the first time.  (Dr. Schneider's records also document this.)

Also, MRIoA supported its final denial by stating that the medical records did not demonstrate "significant radiculopathy or functional deficits in the lower extremities." (SOM 000176). But, Dr. Schneider's case note on April 8, 2011 references worsening pain in Mr. Duffy's lower back and thighs, which had radiated to the left and right thigh. (SOM 000054). He described that symptoms were "aggravated by ascending stairs, extension, lifting, lying/rest, pushing, rolling over in bed, sitting, sneezing, standing, twisting, and walking…" *Id.* Clearly, MRIoA ignored Dr. Schneider's case note when making its denial decision on these grounds.

Second, MRIoA's reviews did not assess whether Mr. Duffy's surgeries are customarily and reasonably recognized as appropriate throughout the neurological community. Rather, MRIoA cited several sources which allegedly contradict the necessity of surgery for Mr. Duffy's condition, based on Mr. Duffy's medical records. MRIoA failed to consider the opinons of Dr. Schneider or Kim Maycock, DC, or any reviewer outside the MRIoA system. For example, Kim Maycock's November 21, 2011 letter states in no uncertain terms: "the results of diagnostic testing ordered out of this office and out of Dr. Schneider's office leave nothing to the imagination and speak for themselves in determining appropriate course of care." (SOM 000127). Nothing in the Record even suggests that Kim Maycock, D.C.'s opinion was given any credence in SOMI/MRIoA's review.

Third, there is not substantial evidence that Mr. Duffy's surgeries could have been omitted without adversely affecting his condition. To the contrary, the medical records indicate that without surgery, Mr. Duffy's degenerative disk disease would have continued to worsen. For example, on

28

April 8, 2011, Dr. Schneider noted that Mr. Duffy's back pain began 15 years prior, and that "the problem is worsening, it occurs persistently." (SOM 000054).  Dr. Schneider also noted that Mr. Duffy's neck pain had worsened, and the frequency of the pain was "constant."  *Id.*  As stated in *McGraw*, "It is as important [for a patient] not to get worse as to get better."  *McGraw*, 137 F.3d at 1261.

Fourth, SOMI did not have substantial evidence to support that Mr. Duffy's surgery was merely for his convenience.  Rather, Mr. Duffy's surgery was necessary so he could carry out the essential tasks of daily living.  Had SOMI actually applied The Plan's definition of "Medical Necessity," its decision to deny coverage would not have been supported by substantial evidence.  Therefore, its decision was arbitrary and capricious.

### E. Defendants arbitrarily and capriciously decided Mr. Duffy's claim because both operated under an inherent conflict of interest.

When an administrator is in a position to "favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries," it operates under a conflict of interest.  *Holcomb*, 578 F.3d at 1192.  Here, both Defendants had an interest in denying Mr. Duffy's claim.  *See, e.g., McGraw*, 137 F.3d at 1259, 1263 (stating less deference is afforded to an administrator's denial decision when the denial decision affects the administrator or fiduciary by "filling or depleting its coffers"); *Adair v. El Pueblo Boys' and Girls' Ranch, Inc. Long Term Disability Plan,* 2007 WL 2788614, *1205 (D. Colo. 2007) (stating, "[i]t is true that, in the context of arbitrary and capricious review under ERISA, we have held that where a party is both the administrator and payor or insurer

of a disability plan 'an inherent conflict exists' such that our review is less deferential.").  Even though FCA delegated some administrative responsibilities, including evaluating medical necessity and deciding claims, to SOMI, it retained overriding authority to interpret The Plan's Terms and decide and pay claims.  Thus, FCA had a financial interest in claims decisions.  SOMI also operated under a conflict of interest because it both decided and paid claims.  Here, SOMI paid $39,717.92 out to NRNS and then realized it only had authority to pay out $30,000 from FCA's stop-loss deductible.  Thus, it had a financial incentive to deny Mr. Duffy's claim and get funds back from NRNS.  Further, SOMI acted both as Contract Administrator for The Plan and also as a facilitator for FCA's stop-loss coverage.  Thus, it represented two competing interests: Mr. Duffy's interest in having his claims paid and FCA's interest in having Mr. Duffy's claims denied if they were denied by Excess Carrier.

Because both Defendants operated under a conflict of interest, this Court must weigh the conflict of interest as a factor in determining whether Defendants abused their discretion.  *See, McGraw*, 137 F.3d at 1259.  Conflict of interest is important here and should be given a great weight in the analysis because the circumstances suggest a high likelihood that it affected the benefits decision and Defendants took no steps to reduce the potential bias in their decision making. *See, Foster*, 693 F.3d at 1232; *Glenn*, 554 U.S. at 117.  As previously noted, the initial benefits decision was to process Mr. Duffy's claims and pay them out under The Plan.  When an insurer has terminated benefits that it initially paid out, it is important to focus on the events that occurred between the conclusion that benefits owed and the decision to terminate them. *Leger*, 557 F.3d at

833.  Here, the event triggering denial of benefits was Excess Carrier's denial of stop-loss coverage, which is one indicator of a conflict of interest.

Other factors present in this case also demonstrate that a conflict of interest was at work. First, Defendants' selective consideration of the evidence not only indicates that the denial decision was arbitrary (as discussed above), but also demonstrates the effects of a conflict of interest.  *See, Holmstrom,* 615 F.3d at 777, *citing, Glenn,* 128 S.Ct. at 2352 (stating that selective consideration of evidence can be a factor suggesting arbitrary administration in its own right, as well as a reason to give more weight to the conflict factor).   "A claimant may demonstrate conflict of interest by showing that the administrator 'emphasized a certain medical report that favored a denial of benefits [and] de-emphasized certain other reports that suggested a contrary conclusion.' " *Id.*  Defendants' selective approach described above indicates conflict of interest at work.

Another indication of the effect of Defendants' conflict of interest is the repeated "moving of the target." *See, Holmstrom*, 615 F.3d at 777 (stating, "[t]his conduct is also an independent factor in the arbitrary-and-capricious inquiry, but an administrator's constant changing of its demands to avoid awarding benefits can also be good evidence of a conflict of interest at work."). For example, here, SOMI requested Dr. Schneider's narrative, but never considered it.  AllMed denied benefits based on lack of evidence of spondylosis, but after records showing spondylosis were provided, lack of medical necessity was found on other grounds.   Similarly, lack of conservative care was cited as a denial reason, but when over 20 years of medical records showing

31

conservative care were provided, Defendants denied Mr. Duffy's claim on other grounds. This "moving of the target," demonstrates the conflict of interest affecting Mr. Duffy's claims.

III.     THIS COURT SHOULD AWARD MR. DUFFY THE PLAN BENEFITS TO WHICH HE IS ENTITLED; ALTERNATIVELY IT SHOULD PROVIDE EQUITABLE RELIEF

Defendants' behavior demonstrates that remanding the claims decision to SOMI/FCA would only permit them to dig up new evidence until they found just the right support for their decision to deny Mr. Duffy's claim. In such case, it is appropriate for the Court to order Plan benefits be reinstated to Mr. Duffy. *See, Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 832 (7th Cir. 2004) (awarding benefits and declining remand, which would simply permit the administrator to "dig up new evidence until it found just the right support for its decision to deny an employee her benefits"). As stated in *Holmstrom*, relief for a plaintiff who has sued to enforce his rights under ERISA depends on what is required in that case "to fully remedy the defective procedures given the *status quo* prior to the denial or termination' of benefits." *Holmstrom*, 615 F.3d at 778, *citing, Schneider v. Sentry Group Long Term Disability Plan,* 422 F.3d 621, 629 (7th Cir.2005). Because the emphasis is on restoring the *status quo* prior to the defective procedures, this Court should award benefits due to Mr. Duffy under The Plan, so that Mr. Duffy's status prior to Excess Carrier's denial and Defendant's subsequent revocation of approval, is restored. *See, Holmstrom*, 615 at 778. Given the merits supporting a determination that Mr. Duffy's surgeries were medically necessary, such relief by this Court is warranted. *See, id.* at 779.

32

In the alternative, Mr. Duffy, as an individual, is entitled to "appropriate equitable relief" under section 1132(a)(3) for breach of fiduciary duty by Defendants. *See, Varity*, 516 U.S. at 510 (holding that subsection (3) permits individual relief for a breach of a fiduciary obligation); *Anweiler v. American Electric Power Service Corporation*, 3 F.3d 986, 993 (7th Cir. 1993) (holding that an individual may seek equitable relief from a breach of fiduciary duty under section 1132(a)(3) pursuant to the statutes plain language and ERISA's broad remedial purpose).

IV.    MR. DUFFY SHOULD BE AWARDED ATTORNEY'S FEES

This Court should exercise its discretion to award Mr. Duffy reasonable attorney's fees and costs incurred in bringing this action. *See*, 29 U.S.C. § 1132(g)(1).  The following nonexclusive list of factors is considered by district courts in deciding whether to exercise discretion to award fees: (1) the degree of the offending party's culpability or bad faith; (2) the degree of the ability of the offending party to satisfy an award of attorney fees; (3) whether or not an award of attorney fees against the offending party would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the plan as a whole; and (5) the relative merits of the parties' positions. *Deboard v. Sunshine Min. & Ref. Co.,* 208 F.3d 1228, 1244 (10th Cir. 2000), *citing, Pratt v. Petroleum Prod. Management Inc. Employee Sav. Plan & Trust,* 920 F.2d 651, 664 (10th Cir.1990).

Applying the five-part test to Mr. Duffy's case, it is clear that Defendants are more culpable than Mr. Duffy, and based on their treatment of Mr. Duffy's claims, should be liable for Mr. Duffy's attorney's fees.  First, Defendants first approved, then denied Mr. Duffy's surgery-related

33

claims only after Excess Carrier refused stop-loss coverage for FCA, which shows bad faith and breach of fiduciary duties.   Second, Defendants are better suited than Mr. Duffy to pay his attorney's fees and costs.   Defendants are large corporations, while Mr. Duffy is an individual on the verge of bankruptcy due to Defendant's actions.   Additionally, FCA has maintained that any liability it may have is attributable to Excess Carrier, which is also more able to pay attorney's fees than Mr. Duffy.   Third, an award of attorney fees against Defendants would deter Defendants and other administrators and fiduciaries from allowing a Plan's stop-loss coverage interfere with interpreting employee benefit plans and deciding claims. Thus, this case might deter other health plan providers from denying benefits in similar circumstances.   Fourth, other members of The Plan may benefit from allocating Mr. Duffy's attorney's fees to Defendants, as this case may curb The Plan's ability to deny benefits, through SOMI when its stop-loss carrier won't cover a loss.   Finally, Mr. Duffy has shown that the Defendants acted arbitrarily and capriciously in denying his claim. Therefore, requiring Defendants to pay Mr. Duffy's attorneys' fees is equitable given the relative merits of the parties' positions.

## CONCLUSION

"Congress enacted ERISA as a comprehensive statute designed to protect employees." *Ogden v. Michigan Bell Telephone Co.*, 595 F.Supp. 961, 969 (E.D. Mich. 1984).   This Court should grant Mr. Duffy's request for benefits because he was arbitrarily and capriciously deprived of The Plan benefits by Defendantfiduciaries acting under a conflict of interest.   Defendants acted arbitrarily and capriciously by deferring to Excess Carrier's determination of medical necessity

34

rather than exercising their own discretion to interpret The Plan and decide benefits in Mr. Duffy's sole interest.  Because Defendants' actions show they were operating under a conflict of interest, this Court must afford Defendants' decision less deference than would otherwise be given.  Finally, the circumstances of this case warrant an award of attorney's fees in Mr. Duffy's favor.

RESPECTFULLY SUBMITTED this 29th day of April, 2013.

**LONABAUGH AND RIGGS, LLP**

_/s/ Angela C. Long_
Jeffrey J. Gonda
Angela C. Long
P.O. Drawer 5059
Sheridan, WY  82801
(307) 672-7444
(307) 672-2230 Fax
*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,577 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

_/s/ Angela C. Long_
P.O. Drawer 5059
Sheridan, WY  82801
(307) 672-7444
(307) 672-2230 Fax
*Attorneys for Plaintiffs*

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2013, I served a true and correct copy of the foregoing by DM-ECF addressed to the following:

Bradley T. Cave, P.C.
Joanna R. Vilos
Holland & Hart, LLP
P.O. Box 1347
Cheyenne, WY 82003-1347
bcave@hollandhart.com
jvilos@hollandhart.com

James L. Edwards
Paul S. Phillips
Stevens, Edwards, Hallock,
Carpenter & Phillips, P.C.
P.O. Box 1148
Gillette, WY 82717
jim@vcn.com
paul.phillips@vcn.com

James C. Worthen
Andrew F. Sears
Murane & Bostwick, LLC
201 N. Wolcott
Casper, WY  82601
jcw@murane.com
afs@murane.com

   /s/ Angela C. Long_____
Angela C. Long
Lonabaugh &Riggs, LLP